# IN THE UNITED STATES DISTRICT COURT FOR THE
# WESTERN DISTRICT OF MISSOURI
# WESTERN DIVISION

| | |
|---|---|
| **UNITED STATES OF AMERICA,**<br><br>Plaintiff,<br><br>v.<br><br>**DANIEL I. RAMIREZ,**<br><br>Defendant. | **Case No.** 21-00093-01-CR-W-GAF |

## GOVERNMENT'S SENTENCING MEMORANDUM

The United States of America, by and through Teresa A. Moore, United States Attorney for the Western District of Missouri, and the undersigned attorney, respectfully submits this sentencing memorandum in the above-captioned matter. For the reasons set forth below, the Government respectfully recommends that this Court sentence Defendant to 87 months' imprisonment for Count One, a concurrent term of 87 months' imprisonment for Count Seven, a consecutive term of 60 months' imprisonment for Count Eight, and an appropriate term of supervised release.

## I. BACKGROUND

On October 19, 2021, Defendant pleaded guilty to Count One of the indictment in the above-captioned matter, charging him with conspiracy to distribute fentanyl, in violation of 21 U.S.C. §§ 841(a)(1) and (b)(1)(C) and 846; Count Seven, possession with the intent to distribute fentanyl within 1,000 feet of a public or private school, in violation of 21 U.S.C. §§ 841(a)(1) and 860(a); and Count Eight, possession of a firearm in furtherance of a drug trafficking crime, in violation of 18 U.S.C. § 924(c)(1)(A)(i). On March 31, 2022, the final Presentence Investigation Report ("PSR") was filed, indicating that Defendant's total offense level, after acceptance of

responsibility, for Count One is 26, with a criminal history category of II. (PSR ¶ 80.) Therefore, Defendant's sentencing range for Count One is 70 to 87 months under the Guidelines. (PSR ¶ 80.) The statutory maximum sentence for Count One is 20 years' imprisonment. (PSR ¶ 76.) Count Seven is grouped with Count One for sentencing purposes under the Guidelines, and is punishable by no more than 40 years' imprisonment, and no less than one year' imprisonment. (PSR ¶¶ 24 & 77.) Count Eight carries a statutory minimum sentence of 60 months' imprisonment, consecutive to any other sentences. (PSR ¶¶ 78 & 80.) Defendant has lodged objections to the PSR that affect the Guidelines calculations.

## II. LEGAL STANDARD

Although the Guidelines are no longer mandatory, *United States v. Booker*, 543 U.S. 220 (2005), sentencing still begins with a properly calculated advisory Guidelines range. *See Gall v. United States*, 128 S. Ct. 586, 596 (2007); *Rita v. United States*, 127 S. Ct. 2456, 2464–65 (2007); *Booker*, 543 U.S. at 245–46; *United States v. Plaza*, 471 F.3d 928, 930 (8th Cir. 2006). Next, the Court must decide if a traditional departure under the Guidelines is appropriate, thus creating an advisory Guidelines sentencing range. *Plaza*, 471 F.3d at 930. After calculating the advisory Guidelines range, the Court considers that range, along with all the factors listed in 18 U.S.C. § 3553(a), in arriving at the final sentence. *Kimbrough v. United States*, 128 S. Ct. 558, 564 (2007); *Plaza*, 471 F.3d at 930.

## III. DISCUSSION

A. **Substantive Objections**

Paragraph 29.

Defendant should receive an enhancement for maintaining a premises for drug distribution. Under U.S.S.G. § 2D1.1(b)(12), a two-level enhancement may be applied for maintaining a

2

premises for the purpose of manufacturing or distributing a controlled substance. This enhancement applies to a defendant who knowingly maintains a premises for storage of a controlled substance for distribution. U.S.S.G. § 2D1.1, cmt. n.17. "In determining whether a defendant 'maintained' a premises, the court should consider whether the defendant had a possessory interest in the premises and the extent to which the defendant controlled access to, or activities at, the premises." *United States v. Renteria-Saldana*, 755 F.3d 856, 859 (8th Cir. 2014). Drug dealing need not be the sole purpose for which the premises is maintained, but must be a major purpose, and the enhancement applies even if the house is also being used as a defendant's residence. *United States v. Miller*, 698 F.3d 699, 706 (8th Cir. 2012).

There is no question that Defendant resided at 304 South Forrest Avenue, Apartment 1, Liberty, Missouri, demonstrating that he had a possessory interest in the premises. (PSR ¶¶ 8–12.) The sole remaining question, then, is whether drug distribution was a major purpose for Defendant maintaining the premises. Given the number of drug transactions Defendant conducted from the premises in a short period of time and the fact that a search of the apartment yielded additional fentanyl and a firearm, it appears drug distribution was a major purpose of the premises. Between March 4, 2021, and March 9, 2021, Defendant or RIOS sold an undercover detective fentanyl on three occasions from the apartment. (PSR ¶¶ 4–10.) Additionally, on March 8, 2021, a detective performing surveillance of the apartment complex observed RIOS conduct an apparent drug transaction with the driver of a Ford Focus. (PSR ¶ 9.) Officers conducted a traffic stop of the Focus and a probable cause search yielded a crushed fentanyl tablet. (PSR ¶ 9.) During an interview, the driver admitted that he purchased the pill from RIOS at an apartment in the complex at 304 South Forrest Avenue. (PSR ¶ 9.) The driver further advised that he obtained approximately 100 fentanyl pills from Defendant and RIOS over the prior eight months. (PSR ¶ 9.) Finally, during

3

a search of the apartment on March 12, 2021, detectives discovered 184 fentanyl tablets, $12,340 in United States currency, and a loaded firearm. (PSR ¶ 12.) These facts justify the assessment of the two-level enhancement under section 2D1.1(b)(12) and Defendant's objection should be overruled.

Pages 9–10.

A review of Defendant's participation in the present offenses reveals that a reduction for being a minor participant is not warranted. The Guidelines provide for a downward adjustment of between two and four levels where a defendant is "substantially less culpable than the average participant in the criminal activity." U.S.S.G. § 3B1.2, cmt. n.2. Whether the adjustment is appropriate is "heavily dependent upon the facts of the particular case." U.S.S.G. § 3B1.2, cmt. n.3. In terms of criminal culpability, Defendant was an average participant in the conspiracy to distribute fentanyl and is not entitled to any downward adjustment of the offense level. As noted by the PSR author, Defendant personally advertised and sold fentanyl, and coordinated his distribution activities with his co-defendant, Valerie RIOS. This is not the behavior of a minor participant that renders him substantially less culpable than the average participant in the criminal activity, and Defendant's objection should be overruled.

B.  **Statutory and Guidelines Calculations**

As to Count One, the PSR finds the Guidelines imprisonment range is 70 to 87 months, with a Guidelines term of one to three years' supervised release. (PSR ¶¶ 80 & 87.) Count Seven is grouped with Count One for sentencing purposes, and the Guidelines recommend a term of supervised release six years. (PSR ¶ 88.) With respect to Count Eight, the PSR concludes the Guidelines term of imprisonment is 60 months, which must be served consecutively to any other

4

Case 4:21-cr-00093-GAF    Document 46    Filed 05/27/22    Page 4 of 13

sentences. (PSR ¶¶ 78–80.) The Guidelines also recommend a term of supervised release of two to five years for Count Eight. (PSR ¶ 89.) The Government concurs with these calculations.

C.      **Statutory Sentencing Factors**

The Court must "impose a sentence sufficient, but not greater than necessary" to address the factors enumerated in 18 U.S.C. § 3553, including the Guidelines issued by the U.S. Sentencing Commission. These factors include:

1.      *Nature and Circumstances of the Offense*

According to the National Institute on Drug Abuse, in 2020 alone, a total of 91,799 Americans died of a drug overdose, which was approximately 251 deaths every day that year.[1] More recently, the Centers for Disease Control and Prevention ("CDC") released provisional data, which predicts that there were over 107,622 drug overdose deaths in the United States between December 2020 and December 2021, or approximately 294 Americans every day.[2] In other words, the same number of Americans lost on September 11, 2001, died of a drug overdose nearly every 10 days. This represents a dramatic, *52 percent* increase in drug overdose deaths since 2019, when there were only 70,630 fatal overdoses. *NIDA Overdose Statistics, supra* note 1. Of the 107,622 predicted overdose deaths between December 2020 and December 2021, approximately 71,238 involved synthetic opioids. *CDC Provisional Overdose Statistics*, *supra* note 2. Fentanyl, the drug Defendant distributed in the present case, is one such synthetic opioid and the one that bears chief

---

[1] *Overdose Death Rates*, Nat'l Inst. on Drug Abuse, https://nida.nih.gov/drug-topics/trends-statistics/overdose-death-rates (last visited May 25, 2022) [hereinafter *NIDA Overdose Statistics*].

[2] *Provisional Drug Overdose Death Counts*, Ctrs. For Disease Ctrl. & Prev'n, https://www.cdc.gov/nchs/nvss/vsrr/drug-overdose-data.htm (last visited May 25, 2022) [hereinafter *CDC Provisional Overdose Statistics*].

responsibility for driving the recent spike in overdoses.[3] This public health and safety crisis has grown so severe that the U.S. Department of Health and Human Services declared the dramatic increase in opioid overdoses a public health emergency in 2017.[4] The crisis has only deepened in the years since.

In March 2021, the U.S. Drug Enforcement Administration ("DEA") issued its 2020 National Drug Threat Assessment.[5] According to the DEA, fentanyl use and availability is on the rise, resulting "in higher rates of fentanyl-involved overdose deaths, straining law enforcement and public health resources in area already afflicted with high levels of heroin-involved overdoses." *Id.* at 9. The assessment explains that in 2018, 31,355 Americans died from synthetic opioid overdoses, which was a 10 percent increase from 2017. *Id.* at 12. Over *twice* that number fatally overdosed on synthetic opioids between December 2020 and December 2021. While other substances are included in the broad category of synthetic opioids, the DEA report notes that the increase in deaths is "likely attributable to increased availability of illicit fentanyl, as rates for licit fentanyl prescriptions and production have not risen in conjunction with the rise in fatal overdoses." *2020 National Drug Threat Assessment*, *supra* note 5, at 12.

The opioid crisis has not affected every region of the United States equally, and the DEA's report finds that the Great Lakes and Northeast have been hardest hit. *Id.* at 12–13. However, the

---

[3] *Facts About Fentanyl*, U.S. Drug Enforcement Admin., https://www.dea.gov/resources/facts-about-fentanyl (last visited May 25, 2022) ("Overdose deaths involving synthetic opioids (primarily illicitly manufactured fentanyl) . . . appear to be the primary driver of the increase in total drug overdose deaths.") [hereinafter *DEA Fentanyl Facts*].

[4] *What is the U.S. Opioid Epidemic?*, U.S. Dep't Health & Human Servs., https://www.hhs.gov/opioids/about-the-epidemic/index.html (last visited May 25, 2022).

[5] *2020 National Drug Threat Assessment*, Drug Enforcement Admin. (March 2021), *available at* https://www.dea.gov/sites/default/files/2021-02/DIR-008-21%202020%20National%20Drug%20Threat%20Assessment_WEB.pdf [hereinafter *2020 National Drug Threat Assessment*].

DEA report cautions that fentanyl use "appears to be expanding into other regions . . . , such as west of the Mississippi River." *Id.* at 12. Sadly, this case illustrates that the opioid epidemic has reached Missouri and is wreaking havoc on our communities. In 2019, Missouri held the dubious distinction of being one of only four states west of the Mississippi River with an age-adjusted rate of drug overdose deaths of more than 21.1 per 100,000.[6] The most recent statistics provided by the Missouri Department of Health and Senior Services ("MDHSS") show that, in 2018 alone, 1,132 Missourians fatally overdosed on opioids.[7] This means that one in every 56 deaths in Missouri in 2018 can be attributed to opioid overdoses. *Id.* And the trend in overdoses is clear—almost every year, we are seeing more Missourians overdose on opioids:[8]

---

[6] *2019 Drug Overdose Death Rates*, Ctrs. For Disease Ctrl. & Prev'n, https://www.cdc.gov/drugoverdose/data/statedeaths/drug-overdose-death-2019.html (last visited May 25, 2022).

[7] *The Death Toll*, Mo. Dep't of Health & Senior Servs., https://health.mo.gov/data/opioids/death-toll.php (last visited May 25, 2022).

[8] *Heroin and Non-Heroin Charts*, Mo. Dep't of Health & Senior Servs., https://health.mo.gov/data/opioids/heroin-non-heroin-charts.php (last visited May 25, 2022).



This epidemic is often counted in lost lives, devastated families, and broken communities, but it can also be counted in dollars. According to data compiled by MDHSS, between 2014 and 2018, the total cost of "opioid misuse emergency room discharge" in Missouri came to $116,733,575.[9] Over $47 million of that sum came from governmental sources, such as Medicaid and Medicare. *Id.*

The overwhelming and steady increase in opioid overdose deaths is alarming. One dose of "heroin" contains on average approximately 0.10 grams of heroin, fentanyl, and/or a fentanyl analog. That individual dose can be fatal, depending on its purity, the user's tolerance, and whether it contains fentanyl or a fentanyl analog, as it often does. In recent years, fentanyl has been

---

[9] *The Burden to Healthcare*, Mo. Dep't of Health & Senior Servs., https://health.mo.gov/data/opioids/burden.php (last visited Dec. 27, 2021).

distributed in pill form, often pressed into pills that appear to be prescription pharmaceuticals. As the DEA explains on its website, this creates unique risks:

> Fentanyl is being mixed in with other illicit drugs to increase the potency of the drug, sold as powders and nasal sprays, and increasingly pressed into pills made to look like legitimate prescription opioids. Because there is no official oversight or quality control, these counterfeit pills often contain lethal doses of fentanyl, with none of the promised drug.
>
> . . .
>
> Producing illicit fentanyl is not an exact science. Two milligrams of fentanyl can be lethal depending on a person's body size, tolerance and past usage. DEA analysis has found counterfeit pills ranging from .02 to 5.1 milligrams (more than twice the lethal dose) of fentanyl per tablet.
>
> . . .
>
> It is possible for someone to take a pill without knowing it contains fentanyl. It is also possible to take a pill knowing it contains fentanyl, but with no way of knowing if it contains a lethal dose.

*DEA Fentanyl Facts*, *supra* note 3. Defendant in the present case was distributing exactly what the DEA is describing—counterfeit pharmaceuticals containing potentially deadly fentanyl. Indeed, there is some evidence that Defendant may have sold fentanyl to Jacob Player, who suffered a potentially fatal fentanyl overdose on March 3, 2021. (PSR ¶ 3.) Alarmingly, there was evidence that Defendant and RIOS may have dragged Player out of their apartment building before seeking medical care for him, and both refused to identify themselves when help arrived. (PSR ¶ 3.)[10] Regardless of whether Player's overdose can be directly attributed to Defendant and RIOS, it is a poignant illustration of the harm caused by the distribution of fentanyl. But for the intervention of the Liberty, Missouri, Police Department and Emergency Medical Services, Player might have died. Between December 2020 and December 2021, approximately 71,238 Americans were not so fortunate, and lost their lives because of fentanyl distributors like Defendant.

---

[10] In watching body camera video of the encounter, Defendant and RIOS are both clearly depicted at the scene.

Finally, Defendant trafficked fentanyl mere feet from the Liberty, Missouri, High School. Sadly, a quick search of news websites yields numerous stories of children in high school making one poor decision—to take a pill they thought was a prescription pharmaceutical—and paying the ultimate price.[11] Defendant's distribution of fentanyl feet from a high school is beyond the pale. Defendant was well positioned to prey upon youth in our community, who are the least likely to appreciate the grave risks associated with taking counterfeit pills containing fentanyl.

For the foregoing reasons, Defendant's conduct in this case warrants a substantial term of imprisonment. Criminal conduct involving poison that kills tens of thousands of Americans every year—and doing so next to a high school—must be met with substantial punishment.

2. *History and Characteristics of Defendant, Need to Promote Respect for the Law, and Need to Afford Adequate Deterrence to Criminal Conduct*

While not lengthy, a review of Defendant's criminal history reveals a lack of respect for public safety and the law. In November 2017, Defendant was arrested in Pleasant Valley, Missouri, after showing signs of driving while impaired by controlled substances, including dangerous driving conduct. (PSR ¶ 42.) Defendant pleaded guilty to driving under the influence of drugs later that month and sentence to two years' probation. (PSR ¶ 42.) Defendant performed poorly on supervision and, in September 2019, a violation report was filed after Defendant was arrested for a new operating under the influence offense. (PSR ¶ 42.)

In May 2019, Defendant was arrested in Clay County, Missouri, after he was found as a passenger in a vehicle containing 85 grams of marijuana, 30 grams of marijuana concentrate, and

---

[11] *See, e.g.*, *Fentanyl Killed a Classmate. Families at Kansas City School Learn How to Prevent More.,* Kansas City Start (Apr. 28, 2022), https://www.kansascity.com/news/local/crime/article260811227.html; *Fentanyl Tainted Pills Bought on Social Media Cause Youth Drug Deaths to Soar*, New York Times (May 19, 2022), https://www.nytimes.com/2022/05/19/health/pills-fentanyl-social-media.html; *Police: Soledad High School Senior Dies from Fentanyl Overdose*, KESQ.com (May 24, 2022), https://kesq.com/news/2022/05/24/police-soledad-high-school-senior-dies-from-fentanyl-overdose/.

47 alprazolam (trade name Xanax) tablets. (PSR ¶ 48.) Defendant was charged with possession of a controlled substance and the case remains pending, with an active warrant for Defendant's arrest. (PSR ¶ 48.) Next in June 2019, Defendant was arrested for operating without insurance, and the case remains pending. (PSR ¶ 49.) In August 2019, Defendant was arrested again for operating under the influence, which was the basis for a probation violation in his prior driving while impaired case. (PSR ¶ 50.) Defendant's August 2019 operating under the influence case remains pending and there is an active warrant for his arrest. Finally, in November 2019, Defendant was arrested for careless driving and driving while revoked, which he was convicted of in March 2021. (PSR ¶ 43.) Defendant also has uncharged arrests for possession of marijuana, possession of drug paraphernalia, driving while intoxicated, and felony possession of a controlled substance. (PSR ¶¶ 51–54.)

In light of this history, a meaningful sentence is necessary to instill respect for the law that may serve to deter further criminal conduct. In spite of previous, less-severe deterrent measures and attempts at rehabilitation, Defendant continues to engage in criminal activity that puts the community at risk. Defendant has demonstrated that only a significant term of incarceration will adequately address his criminal conduct and imprisonment is needed to deter him from reoffending.

    3.    *Need to Protect the Public from Further Crimes of the Defendant*

Defendant has shown that he poses a danger to the community by his actions in this case and criminal history. Defendant conspired to distribute deadly fentanyl near a high school in the Kansas City metropolitan area and, as such, a sentence that will incapacitate him in the interest of public safety is warranted.

4. *Need to Provide Defendant with Education, Vocational Training, or Other Correctional Treatment*

The Government does not oppose Defendant's participation in any education, vocational training, or treatment once incarcerated.

## IV. **CONCLUSION**

Section 3553 requires the Court to impose a sentence that considers the factors above, including the advisory Guidelines range. The Government respectfully requests that Defendant's behavior and history, the need to promote respect for the law, the need to deter criminal conduct, the need to protect the public from Defendant, and any other statutory sentencing factors be considered in reaching an appropriate sentence. Based on the foregoing factors, the Government recommends that this Court impose a sentence of 87 months' imprisonment for Count One, a concurrent term of 87 months' imprisonment for Count Seven, a consecutive term of 60 months' imprisonment for Count Eight, and an appropriate term of supervised release.

Respectfully submitted,

TERESA A. MOORE
United States Attorney
Western District of Missouri

By  */s/ Byron H. Black*
Byron H. Black
Assistant United States Attorney
Minnesota Bar No. 0395274
Charles Evans Whittaker Courthouse
400 East Ninth Street, Room 5510
Kansas City, Missouri 64106

## CERTIFICATE OF SERVICE

    The undersigned hereby certifies that a copy of the foregoing was delivered on May 27, 2022, to the CM-ECF system of the United States District Court for the Western District of Missouri for electronic delivery to all counsel of record.

                                               */s/ Byron H. Black*
                                               Byron H. Black
                                               Assistant United States Attorney